In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 19-1241

ADETOKUNBO PHILIP FAYEMI,

*Petitioner-Appellant*,

*v.*

EMILY RUSKIN, Warden, Lincoln Correctional Center,

*Respondent-Appellee*.

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 17-3210 — **Sue E. Myerscough**, *Judge*.

---

ARGUED APRIL 28, 2020 — DECIDED JULY 16, 2020

---

Before EASTERBROOK, RIPPLE, and SCUDDER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Agatha Christie's *The Pale Horse* (1961) introduced thallium poisoning to the world of detective fiction. In the novel people become ill and weaken; their hair falls out; eventually they die. No one understands why. Historian Mark Easterbrook starts to investigate. Soon a friend aiding him is desperately ill, but with the aid of Ariadne Oliver he solves the mystery and the friend recovers.

The murderers had been taking wagers: someone who wanted another person's death would wager that the other person would live and deposit the stakes with a bookie; the gang would arrange for the bettor to "lose" (and themselves to win) because each intended victim would be poisoned. The obscure symptoms of thallium poisoning enabled them to kill people for years before being caught.

In 2002 Alice Minter became ill and weakened; her hair fell out; while in a hospital she entered a coma and seemed on the brink of death. Medical tests superior to those available in 1961 revealed the cause: her blood and urine contained vastly more thallium than the natural concentration. For a few months her fiancé Adetokunbo Fayemi had been providing some of her food and drink (something that continued while she was in the hospital). Seven of Minter's friends and relatives who ate occasionally at her home or hospital room also suffered from thallium poisoning, though to a lesser degree. Her dog died of thallium poisoning after it ate scraps from her table.

Evidence at Fayemi's trial for attempted murder showed that he had purchased 50 grams of thallium sulfate, enough to kill about 50 people. Fayemi falsely told the supplier that he needed the substance for research but asserted in court that he and Minter wanted it to kill rats and mice, a forbidden use. Fayemi's defense was that Minter had been careless with her share of the poison, but the fact that Fayemi often ate at Minter's house without showing any traces of thallium poisoning—and that a good deal of thallium was found in a salt shaker (thallium sulfate is a tasteless white powder that looks like salt) in Fayemi's kitchen—embarrassed that defense. A toxicologist testified that Fayemi's body contained

only the amount of thallium that would be expected in one who handled the substance but did not ingest any. The jury also heard that Fayemi owned many other poisons and had threatened to kill Minter if she left him.

The jury convicted Fayemi of attempting to murder Minter plus seven counts of aggravated battery with respect to the seven other victims. He was sentenced to 27 years in prison. The convictions were affirmed on appeal, and a state court rejected a collateral attack. 2016 IL App (4th) 140480-U (June 23, 2016). A federal judge denied his petition for a writ of habeas corpus under 28 U.S.C. §2254. 2019 U.S. Dist. LEXIS 3814 (C.D. Ill. Jan. 9, 2019).

The only argument that has made it to this court is that Fayemi's trial lawyer violated the Sixth Amendment (applied to the states through the Fourteenth) by telling the jurors, in his opening statement, that Fayemi would testify. Counsel used this to introduce the theory of defense—that Minter asked Fayemi to get the thallium for her and was careless with it. Fayemi had told his lawyer that he would testify. But after the state judge decided that some of his prior convictions, plus evidence that he owned and had annotated at least one book about how to poison people, could come in on cross-examination, counsel persuaded Fayemi not to testify. Fayemi waived that right in open court. On collateral review his theory is that a lawyer furnishes ineffective assistance by promising that the defendant will testify, when the defendant may change his mind. Every judge who has looked at the case so far has rejected that argument.

We may assume that counsel's strategy backfired when Fayemi changed his mind, though it is hard to presume that the jury held this against the defense. It was given a stand-

ard instruction not to draw an adverse inference. And mention of potential testimony gave counsel a means to introduce the theory of defense before the jury heard the prosecution's case. Minter testified, for example, that she had never heard of thallium before her illness and did not ask for any from Fayemi; counsel's opening statement may have helped the jurors keep open minds about that subject pending the defense case. Sometimes lawyers take risks that seem justified but do not pan out; this may have been such a situation.

*Strickland v. Washington*, 466 U.S. 668 (1984), holds that, to establish ineffective assistance, the defendant must show both deficient performance and prejudice. That standard requires deference to counsel's decisions. And the 1996 amendment to §2254(d)(1) adds a layer of deference to the state judiciary by providing that federal collateral relief may not be granted unless the state court has rendered "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". (There are other routes to collateral relief, but this is the only one that matters to Fayemi.) The Justices have called the result a "doubly deferential" standard. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The state's appellate court cited *Strickland* and quoted the central features of its standard, so §2254(d)(1) applies.

Fayemi makes a standard *Strickland* argument but implies in several portions of his brief that it is *automatically* ineffective assistance—in other words, that a defendant need not show prejudice—when in an opening statement a lawyer promises to present a key witness who never testifies. He cites *Barrow v. Uchtman*, 398 F.3d 597, 606 (7th Cir. 2005), and *Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003), which

deprecated any promise that the defendant will testify, and asserts that "such an error is both objectively unreasonable and prejudicial to the defendant." We address that possibility before turning to the normal *Strickland* inquiry.

Neither *Barrow* nor *Hampton* holds that an unfulfilled promise brings a case within the scope of *United States v. Cronic*, 466 U.S. 648, 659 (1984), which says that prejudice need not be shown if the lawyer does not appear for trial. See also *Garza v. Idaho*, 139 S. Ct. 738 (2019) (lawyer who fails to take an appeal). Mistakes in handling trials, by contrast, are the domain of *Strickland*. We have been told not to extend *Cronic* on collateral review. See, e.g., *Woods v. Donald*, 575 U.S. 312 (2015); *Wright v. Van Patten*, 552 U.S. 120 (2008).

It would not be sound to read *Barrow* or *Hampton* as announcing a *per se* rule that prejudice does not matter—and, at all events, they cannot be applied to proceedings within the scope of §2254(d)(1), which tells us that only decisions of the Supreme Court matter on collateral review of state-court judgments. A court of appeals must not rely on its own precedents as the basis of collateral relief. See *Kernan v. Cuero*, 138 S. Ct. 4 (2017). See also *Wilborn v. Jones*, No. 18-1507 (7th Cir. July 6, 2020). And the Supreme Court has never hinted at a *per se* rule that defense lawyers must keep all promises made in opening statements, even if a mid-trial change in circumstances alters the defense strategy.

Still, Fayemi contends that the appellate court's decision was "contrary to" *Strickland* because the opinion misstates what is required to show prejudice. It recited the standard three times. First it said that "[p]rejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." 2016 IL App (4th) 140480-U at ¶46. That's
exactly what the Supreme Court said in *Strickland*, 466 U.S.
at 694. But in ¶48 the court quoted an earlier state decision
as asking whether the result of the case "would likely have
been different", a phrase it repeated in ¶50. This shows ac-
tion "contrary to" *Strickland*, Fayemi insists. Yet we do not
attribute to the state's judiciary an unexplained replacement
of the correct standard with an incorrect one. It is more re-
spectful to treat the language in ¶¶ 48 and 50 as shorthand
versions of the complete statement at ¶46. The Supreme
Court has encountered incomplete or inaccurate shorthand
before and held that it does not justify relief, as long as the
state court makes clear its understanding of the correct
standard. See *Holland v. Jackson*, 542 U.S. 649, 654–55 (2004);
*Woodford v. Visciotti*, 537 U.S. 19, 22–24 (2002). See also, e.g.,
*Sussman v. Jenkins*, 636 F.3d 329, 359–60 (7th Cir. 2011); *Woods
v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009); *Stanley v.
Bartley*, 465 F.3d 810, 813 (7th Cir. 2006).

Because the state court did not render a decision "contra-
ry to" law clearly established by the Supreme Court, we ask
whether it applied that established law "unreasonably". It
did not. The state's appellate judges concluded that, whether
or not counsel's performance was deficient, there was no
possibility of prejudice. The decision did not turn on a line
between "reasonable probability" and some other standard.
Instead the court remarked that the evidence against Fayemi
was "overwhelming" (¶49). The evidence we have men-
tioned deserves that label, and there was more. The trial
judge told the jury to disregard Fayemi's decision not to tes-
tify. It is inconceivable that one sentence in the opening

statement (counsel's sole mention that the jurors would hear from Fayemi) could have affected this verdict.

AFFIRMED