In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3435

ANTHONY C. OLVERA,

*Petitioner-Appellant,*

*v.*

DAVID GOMEZ, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:15-cv-04042-SLD — **Sara Darrow**, *Chief Judge.*

ARGUED JANUARY 14, 2021 — DECIDED JUNE 22, 2021

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Petitioner Anthony Olvera was the driver in a gang-related, drive-by shooting that resulted in the death of an innocent bystander. An Illinois jury found Mr. Olvera guilty of first-degree murder on the theory that he was accountable for the shooter's conduct. Mr. Olvera now seeks postconviction review, claiming that his trial counsel provided ineffective assistance by conducting an inadequate pretrial investigation. The state courts denied Mr. Olvera's

petition. He then filed this petition for habeas corpus under 28 U.S.C. § 2254. The district court denied relief. We now affirm the district court's judgment.

## I

## BACKGROUND

Mr. Olvera's conviction stems from the January 8, 2000, shooting death of Stephen Stropes, the victim of a gang-related drive-by shooting in East Moline, Illinois. It is undisputed that Mr. Olvera's codefendant, Kristian Delgado, fired the shot that killed Stropes. It is also undisputed that Mr. Olvera was the driver of the vehicle and did not fire any shots that evening. Delgado pleaded guilty to murder, and the State prosecuted Mr. Olvera on the theory that he was accountable for Delgado's actions that killed Stropes.

The tragic events of January 8 started with a rather trivial argument. Mr. Olvera's girlfriend, Guadalupe Raya, was at a party where she got into an argument with members of the Latin Kings gang. She accused them of using her camera to take photos of themselves flashing gang signs. The Latin Kings are a rival of the Bishops gang of which Mr. Olvera and Delgado were members. Upset over the camera incident, Raya called Mr. Olvera and asked him to pick her up from the party. Mr. Olvera drove over with Delgado in the passenger seat. As they approached the house where Raya was waiting, they passed the group of Latin Kings, who also had left the party and were standing on a street corner. Delgado fired one shot out of the car window on the first pass; then he and Mr. Olvera picked up Raya, turned around, sped off in the direction of the Latin Kings, and fired several more shots at the Latin Kings on the second pass. It was during the second pass

that a bullet struck Stropes in the head; he was later pronounced dead.

**A.**

The State's theory at trial was that Mr. Olvera was accountable for Delgado's firing at the Latin Kings on the second pass and killing Stropes.[1] The State called Raya as a witness. She testified that she was at a party, got into an argument with Latin King gang members, and called Mr. Olvera at his friend Daniel Mendoza's house to come and pick her up. As she waited outside for Mr. Olvera, she saw the Latin King members and then heard a loud noise. Immediately after hearing the loud noise, Mr. Olvera and Delgado pulled up in Mr. Olvera's four-door Buick sedan. Raya testified that Mr. Olvera told her to get in the car and duck. As she hid on the floor of the Buick's backseat, she heard several loud noises and smelled smoke. Raya testified that shortly after the shooting, Mr. Olvera sold the Buick sedan to an out-of-town acquaintance. She also testified that she never saw a gun and that she never heard Mr. Olvera tell Delgado to shoot at the Latin Kings.

Raya's friend, Alma Mendoza, who had hosted the party on the evening of the shooting, also testified. Her testimony corroborated Raya's story about her getting into an argument with the Latin Kings. Alma Mendoza also identified the Latin

---

[1] Under Illinois law, an individual can be accountable for the criminal acts of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c).

King members at the party as Michael Olvera,[2] Johnny Rigsby, Gabino Gutierrez, Leo Reyes, and Jose Perez. Alma Mendoza told the jury that she did not want gang-related problems at her party, so she asked Raya and the Latin Kings to leave. She also testified that she heard something that sounded like "three fireworks" after Raya and the group of Latin Kings left the party.[3]

Tara Ramos, another partygoer, testified that she saw Raya get into a car after leaving the party. The driver of that car, Ramos testified, bent over and appeared to grab something from under his seat. She said that the driver yelled for Raya to get quickly into the car, which then sped down the street. She then heard gunshots.

Four of the Latin King members at whom Delgado fired—Reyes, Rigsby, Michael Olvera, and Gutierrez—also testified. The fifth member, Perez, was out of the state at the time of Mr. Olvera's trial.

Gutierrez testified that he and the four other Latin Kings left the party and were standing on the corner of 15th Avenue and 12th Street. A car pulled around the corner and stopped next to them. The passenger then stuck a gun out the window. As the Latin King members fled, they heard a gunshot. Gutierrez, Perez, and Reyes ended up on 18th Avenue. There, Gutierrez saw the car speeding closer again. On this second pass, he testified that he saw the front-seat passenger lean out the window before firing two or three more shots. Reyes

---

[2] Michael Olvera is Mr. Olvera's cousin. We will include Michael Olvera's first name in all references to avoid confusion with the petitioner, who we will continue to refer to as Mr. Olvera.

[3] R.8-16 at 53.

testified along the same lines as Gutierrez. Reyes added that he heard someone in the car yell "King blink," which is a disrespectful term to members of the Latin Kings.[4]

Rigsby testified that although Perez, Reyes, and Gutierrez fled after seeing the gun on the car's first pass, he and Michael Olvera remained. He also testified to hearing a single gunshot followed by three more a short time later. Michael Olvera testified along the same lines as Rigsby.

David Routien, a local pastor and disinterested witness, testified that he heard three gunshots as he was preparing his evening sermon. When he looked out his window, he saw three young Hispanic men running down 18th Avenue.

Lucille Starkey, another disinterested witness, testified that as she was driving home from work, a four-door sedan pulled in front of her car. Both the sedan and her car turned onto 18th Avenue. She testified that she saw Stropes standing by a tree, saw someone else run by him, then heard gunshots and saw Stropes collapse. The sedan in front of her sped away right after the gunshots. Starkey later identified Mr. Olvera's Buick as the car she saw.

Two witnesses testified that Mr. Olvera told Delgado to shoot at the Latin Kings. The first was Jolene Montalvo, who was dating Mr. Olvera's friend, Robert Espinoza. Montalvo initially testified in the grand jury proceedings. During her trial testimony, Montalvo claimed not to remember events to which she had testified during the grand jury proceeding. The prosecutor therefore used Montalvo's grand jury transcripts to refresh her recollection throughout her trial testimony.

---

[4] R.8-17 at 84.

Ultimately, she testified that four days after the shooting, she overheard Mr. Olvera tell Espinoza that the Latin Kings rushed the car and that he told Delgado to shoot in the air to scare them away. She also testified that Mr. Olvera said the second shooting happened when he thought the Latin Kings were going to shoot at the car.

The other witness was Darrin Rhodes, an inmate housed on the same cellblock as Mr. Olvera during Mr. Olvera's pretrial custody. Rhodes testified that he spoke with Mr. Olvera about his case several times and Mr. Olvera said he instructed Delgado to shoot at the Latin Kings. Mr. Olvera also told Rhodes that after the shooting, he and Delgado scratched the inside of the gun barrel to prevent forensic tracing.

Mr. Olvera's friend, Daniel Mendoza, to whose house Delgado and Mr. Olvera went following the shooting, also testified at the trial. Police arrested Delgado at Mendoza's house after the shooting and recovered evidence from the residence. While arresting Delgado, the police recovered a .45-caliber handgun that forensics later matched to shell casings found near both shooting scenes. Mendoza testified that he had been convicted for filing down the serial number on the gun and that he had been subpoenaed to appear at the trial.

The jury also heard evidence that shortly after the shooting, Mr. Olvera sold his Buick. Police spotted the Buick ten days after the shooting. When they stopped the car, they identified the driver as John Teague. Upon searching the car, the police found Mr. Olvera's license plates and registration, as

well as paperwork purporting to transfer the title of the car from Mr. Olvera to "Boy Tiegue" a day earlier.[5]

Mr. Olvera called a hairdresser, Marisol Sandoval, as a defense witness. Sandoval testified that, according to her appointment logs, Mr. Olvera was in her salon at the time when Montalvo said she overheard Mr. Olvera speaking to Espinoza at Espinoza's apartment. Sandoval's testimony, Mr. Olvera contended, undercut Montalvo's credibility.

After the parties rested, the jury deliberated for approximately one half-hour before returning a guilty verdict. The Illinois courts later upheld his murder conviction on direct appeal.[6]

## B.

In May 2002, Mr. Olvera sought postconviction review of his conviction in the Illinois state courts. His primary allegation was that his trial counsel had failed to "contact or call" several witnesses "whose testimony would have been of significant benefit to him."[7] In support of his petition, he attached affidavits from multiple witnesses and potential witnesses, seven of whom are relevant to his appeal here.[8]

---

[5] *Id.* at 2.

[6] R.8-1 (unpublished order resolving direct appeal).

[7] R.8-11 at 85.

[8] There were two additional affidavits, one from partygoer Tara Ramos and another from Mr. Olvera's friend Rose Garza. The state appellate court concluded that neither impacted the ineffective assistance inquiry, and Mr. Olvera does not challenge the decision with respect to those two affidavits.

*First*, Robert Espinoza averred that his girlfriend, Montalvo, testified falsely to having overheard Mr. Olvera admit to Espinoza that he had told Delgado to fire at the Latin Kings. According to Espinoza, no such conversation occurred. Espinoza posited that Montalvo had lied to gain leniency in a federal racketeering case he faced at the time of Mr. Olvera's trial. Espinoza also noted that Mr. Olvera's attorney knew of his whereabouts during the trial but never contacted him.

*Second*, Damian Olvera, another cousin of Mr. Olvera, averred that he heard Espinoza tell Montalvo on multiple occasions to testify against Mr. Olvera. Damian Olvera did not come forward with this information until May 2002, after speaking with Mr. Olvera.

*Third*, Daniel Mendoza averred that he was with Mr. Olvera and Delgado on the night of the shooting. He claimed that Mr. Olvera received a call from Raya to pick her up from the party and that he did not hear Mr. Olvera ask Delgado to accompany him.

*Fourth*, John Teague averred that he purchased Mr. Olvera's Buick following the shooting. He also claimed that he was already in discussions with Mr. Olvera about buying the car prior to the shooting. He added that Mr. Olvera's counsel never contacted him about testifying. Teague has since died.

*Fifth*, Jose Perez, the Latin Kings member who was unavailable during Mr. Olvera's trial, averred that after Mr. Olvera's car turned onto 18th Avenue, he saw Reyes run at the car, then heard shots fired.

*Sixth*, Michael Olvera averred that he overheard a conversation between Perez, Reyes, and Gutierrez discussing

Reyes's running at the Buick before the shots were fired. Michael Olvera did not claim in his affidavit that Mr. Olvera's counsel never contacted him. He did, however, state that he would testify to hearing the conversation if called at a future trial.

*Seventh*, Kristian Delgado averred that he decided to join Mr. Olvera on the trip to pick up Raya on the night of January 8, 2000, on his own volition, not because Mr. Olvera extended an invitation. Nor, according to Delgado's affidavit, did Mr. Olvera know that Delgado was carrying a firearm. Delgado also averred that he fired the shot in the air on the first pass of the Latin King members without Mr. Olvera's direction. He claimed that Mr. Olvera became upset at his decision to fire during the first pass. On the second pass, he claimed that one of the Latin Kings ran toward the car and he fired at the charging person out of fear that the Latin King was going to shoot at the Buick.

Delgado added to this account in a second affidavit. There, he claimed that Mr. Olvera told him to get out of the car after the first shooting but that he pointed his gun at Mr. Olvera and said he would harm Mr. Olvera if he told anyone about the shooting. He also added that he thought he saw a gun in the hand of the charging Latin King. He added that his statements from his own sentencing hearing, in which he said Mr. Olvera told him to fire, were false. He now claims to have made those statements in the hope of receiving a lesser sentence. Finally, Delgado claimed that Mr. Olvera's counsel did not contact him about testifying on Mr. Olvera's behalf.

The Illinois Circuit Court denied Mr. Olvera's postconviction petition. Mr. Olvera then appealed, claiming that the affidavits showed that trial defense counsel was ineffective for

failing to investigate the self-defense argument raised in Delgado's affidavit. The Illinois Appellate Court reviewed his petition de novo and affirmed the trial court's decision. It concluded that none of the affidavits that Mr. Olvera had submitted were sufficient on their own, or in combination, to establish ineffective assistance of counsel. For six of the seven affidavits, the appellate court held that they failed to show deficient performance by Mr. Olvera's counsel: (1) Delgado's affidavit "relate[d] to appropriate trial strategy"; (2) Daniel Mendoza's affidavit was both "speculative" and only stated that Mr. Olvera did not tell Delgado to join him on the trip to pick up Raya; (3) Teague's affidavit was about events that happened after the shooting, thus irrelevant to whether Mr. Olvera was culpable under Illinois law for Delgado's shooting Stropes; (4) Damian Olvera's affidavit was about information that Mr. Olvera's counsel would not have reasonably uncovered ahead of the trial; (5) Michael Olvera's affidavit was inadmissible hearsay; and (6) Perez was out of the state at the time of Mr. Olvera's trial, so he could not have been called to testify.[9] For the seventh affidavit, that from Espinoza, the appellate court went straight to the prejudice prong and held that, even with Espinoza's proposed testimony, there was still substantial evidence to convict Mr. Olvera.

## C.

After exhausting his state review, Mr. Olvera filed this petition under 28 U.S.C. § 2254, submitting that the state appellate court's decision was both contrary to and an unreasonable application of the Supreme Court's holding in *Strickland v.*

---

[9] R.8-5 at ¶ 17.

*Washington*, 466 U.S. 668 (1984).[10] On the "contrary to" argument, Mr. Olvera alleged that the state court required him to prove that he would have been acquitted in order to demonstrate prejudice. The district court rejected this argument, noting that even though the state appellate court misarticulated the *Strickland* prejudice definition at one point in its opinion, it had earlier articulated the correct definition.

On the "unreasonable application" argument, the district court found no basis to upset the state appellate court's decision. The district court held that the state appellate court did not unreasonably apply *Strickland* when it disposed of Espinoza's affidavit on the prejudice prong. Even if the jury had heard Espinoza's proposed testimony, they still would have heard Rhodes's testimony about Mr. Olvera's jailhouse confession and Raya's testimony about Mr. Olvera telling her to duck in the Buick and then hearing the shots. The district court also held that the state appellate court did not act unreasonably in resolving the other six affidavits on *Strickland*'s deficient performance prong.

The district court then granted Mr. Olvera a certificate of appealability because it believed that reasonable jurists could disagree with its decision. *See* 28 U.S.C. § 2253(c).

---

[10] The parties agree that the district court correctly identified the state appellate court's opinion as the last reasoned state court opinion, and thus the opinion we should look to on review. *See Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016).

## II

## DISCUSSION

We review a district court's denial of habeas relief de novo.[11] *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019). When a person in custody pursuant to a judgment of a state court asks the district court to grant habeas relief from a criminal judgment imposed by a state court, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs, and greatly curtails, its review. *See Hicks v. Hepp*, 871 F.3d 513, 524 (7th Cir. 2017). A federal court may set aside a state court's legal determinations only when the state court's adjudication of the petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

This standard is purposefully difficult to satisfy. *See Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). Legal error by the state court only warrants relief when the state court's decision is "unreasonably wrong under an objective standard." *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 410–11 (2000)). A state court acts contrary to Supreme Court precedent when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court's legal decision may also be objectively unreasonable if it "identifies the correct governing legal principle

---

[11] The district court exercised its jurisdiction under 28 U.S.C. §§ 1331, 2241, and 2254. We exercise ours under 28 U.S.C. §§ 1291 and 2253.

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Mr. Olvera's petition asserts that the state appellate court's decision was *both* contrary to and an unreasonable application of the Supreme Court's clearly established law in *Strickland v. Washington*, 466 U.S. at 668, which sets out the framework for evaluating ineffective assistance of counsel claims.

When a habeas petitioner challenges his conviction based on ineffective assistance of counsel, the Supreme Court's case law imposes a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). AEDPA provides the first layer of deference to the state court, and substantive Sixth Amendment law provides the second layer of deference to defense counsel. *See id.*

It is well established that the Sixth Amendment requires effective assistance of counsel. To determine whether a petitioner has been deprived of this guarantee, we employ the familiar two-pronged test from *Strickland*, 466 U.S. at 688. First, we determine whether an attorney's "representation fell below an objective standard of reasonableness." *Id.* When counsel makes a "thorough [pretrial] investigation of [the] law and facts," counsel's trial strategy is "virtually unchallengeable." *Id.* at 690. In contrast, when counsel's pretrial investigation is less than complete, counsel's strategic choices are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. In short, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

The Supreme Court has elaborated on the *Strickland* standard in ways that are pertinent to the task at hand. In *Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003), the Court emphasized that in applying *Strickland*'s first prong, we may not assume that counsel's decision to limit an investigation was reasonable without actually inquiring into why counsel stopped investigating.[12] For example, if counsel never bothers to find out what a potential witness may say on the stand, counsel's decision not to call that witness to testify cannot be passed off as a matter of strategy. *See Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("According to [two potential witnesses'] affidavits, which were treated as true for purposes of the state courts' summary disposition, [the petitioner's] lawyer never even interviewed them to learn what they might say. On that limited record before the state courts, the courts had to assume the lawyer was not aware of the specifics of their potential testimony."). In short, assigning strategic value to counsel's decision requires addressing "the adequacy of the pretrial investigation, which was clearly established under *Strickland* as the critical threshold question." *Campbell v. Reardon*, 780 F.3d 752, 766 (7th Cir. 2015).

*Strickland*'s second prong asks whether the defendant suffered any prejudice as a result of counsel's deficient performance. *See Strickland*, 466 U.S. at 693. As the Supreme Court put it in *Strickland*, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability

---

[12] *See also Campbell v. Reardon*, 780 F.3d 752, 764 (7th Cir. 2015) ("If counsel's decision not to investigate [two potential witnesses] was itself unreasonable, then his decision not to present their testimony—and to rely on [an alternative] theory instead—was too ill-informed to be considered reasonable.").

that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. A reasonable probability, the Court said, "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

With this doubly deferential framework in mind, we first will address Mr. Olvera's claim that the state court acted contrary to *Strickland*, then turn to his claim that the state court unreasonably applied *Strickland*.

**A.**

Mr. Olvera's first argument relies on § 2254(d)(1)'s "contrary to" clause. He focuses on the state appellate court's statement that even if Espinoza's affidavit were true, the other evidence against Mr. Olvera "was so substantial that we cannot find this new evidence *would have resulted in an acquittal*. Therefore, we find that defendant was not prejudiced and counsel was not ineffective."[13] Mr. Olvera points out correctly that *Strickland*, 466 U.S. at 694, only requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." He submits that, by misstating the burden for establishing prejudice, the state appellate court acted contrary to *Strickland*.[14]

---

[13] R.8-5 at ¶ 18 (emphasis added).

[14] Mr. Olvera also likens his case to *Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020), in which the Supreme Court found lacking the *Strickland* inquiry conducted by the Texas Court of Criminal Appeals. But there, the Texas court denied the petitioner's *Strickland* claim in a single sentence, leaving the Supreme Court to wonder whether it "considered *Strickland* prejudice at all." *Id.* Here, there is no doubt the Illinois Appellate Court considered prejudice; Mr. Olvera simply contends that the court applied the wrong definition of prejudice.

The State acknowledges that the appellate court was wrong to reference acquittal in its analysis but nevertheless contends that the court's error was simply an inartful articulation of *Strickland*'s prejudice inquiry. It invites our attention to two other aspects of the state appellate court's opinion as evidence that the state court applied the correct *Strickland* prejudice standard. First, the State notes that on the same page that the appellate court misstated the standard, it also quoted the correct *Strickland* prejudice standard. Second, the State notes that immediately following the erroneous articulation of prejudice, the state appellate court cited *People v. Thompson*, 835 N.E.2d 933, 937 (Ill. App. Ct. 2005), which contains the correct articulation of *Strickland*'s prejudice prong. Reading the state appellate court's opinion in its totality, the State submits that the appellate court applied the correct standard, even if in one part of its opinion it mistakenly articulated that standard.

The State is correct. The Supreme Court has said, explicitly, that "use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited." *Holland v. Jackson*, 542 U.S. 649, 655 (2004) (per curiam). When examining a state court's articulation of the *Strickland* standard, we must keep in mind "the presumption that state courts know and follow the law" and give their articulation of that standard "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). A pair of our decisions illustrate how this deference operates in circumstances like those presented here. In *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006), we encountered a state court opinion that correctly stated the *Strickland* prejudice standard in one section, but later stated the standard as requiring a showing that absent counsel's error the outcome of the trial *would* have

been different—thus appearing to raise the standard beyond the "reasonable probability" that *Strickland* imposes. We gave the state court the "benefit of the doubt," holding that it had not acted contrary to *Strickland*. *Id.* Instead, we observed that because the state court "expounded the well-known standard correctly on the previous page of its opinion, it is more likely that the court stated its conclusion imprecisely than that it applied a different standard." *Id.* (citing *Visciotti*, 537 U.S. at 19).

More recently, in *Fayemi v. Ruskin*, 966 F.3d 591, 594 (7th Cir. 2020), we reviewed a state court decision that correctly stated *Strickland*'s prejudice definition but later twice mistakenly asked whether the result of the case "would likely have been different." We rejected the petitioner's argument that the state court acted contrary to *Strickland*, instead reiterating that "we do not attribute to the state's judiciary an unexplained replacement of the correct standard with an incorrect one." *Id.* The more respectful approach, we said, was to treat the later mistaken statements as shorthand for the correct definition that the state court noted earlier in its opinion.[15] *See id.*

---

[15] To be sure, these are not the only two cases that illustrate the "benefit of the doubt" principle. Similar cases from our court include: *Sussman v. Jenkins*, 636 F.3d 329, 359–60 (7th Cir. 2011) (state court opinion omitting "reasonable probability" language in conclusion did not demonstrate that the state court employed incorrect standard); *Woods v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009) ("We have noted numerous times that there is no error when a court has correctly noted the *Strickland* standard and then used an incorrect shorthand version when stating its conclusion."). Our case law is also consistent with that from our sister circuits. *See, e.g.*, *Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013) (explaining that, viewed as a whole, the state court's opinion "indicates that the state habeas court omitted the 'reasonable probability' modifier not due to its incorrect understanding of the prejudice standard, but as a shorthand method to refer to

Mr. Olvera attempts to distinguish his case from the others we have decided by noting the exact wording of the mistaken prejudice definition here. He correctly notes that our past cases involved different incorrect formulations of *Strickland*'s prejudice prong. Yet those slight differences do not make for a genuine distinction. We still give the state court the benefit of the doubt. *See Visciotti*, 537 U.S. at 24. And our past decisions encountered mistaken definitions of roughly equal significance. *See, e.g.*, *Sussman v. Jenkins*, 636 F.3d 329, 359–60 (7th Cir. 2011) (state court opinion omitted "reasonable probability" when defining prejudice but was not contrary to *Strickland*).

Mr. Olvera admits that the state appellate court included the correct *Strickland* framework on the same page that it stated the mistaken definition of prejudice. As we said in *Fayemi*, the approach that most respects the state appellate court is to treat the second, mistaken statement as a shorthand for the earlier correct definition. Treating the mistaken definition as shorthand makes even more sense in Mr. Olvera's case because the state court followed the statement with a citation to a decision that included the correct definition of prejudice.[16] Absent circumstances that would raise a grave concern that the state court actually applied a contrary standard, we see no basis to override the benefit of the doubt that § 2254 provides to the state court's decision.

---

the correct standard"); *Williams v. Roper*, 695 F.3d 825, 832 (8th Cir. 2012) (similar); *Bledsoe v. Bruce*, 569 F.3d 1223, 1231–33 (10th Cir. 2009) (similar).

[16] R.8-5 at ¶ 18 (citing *People v. Thompson*, 835 N.E.2d 933 (Ill. App. Ct. 2005)).

**B.**

We now examine Mr. Olvera's contention that the state appellate court unreasonably applied *Strickland* when it held that the affidavits that he submitted in support of his state petition did not, individually or collectively, demonstrate ineffective assistance of counsel. The state appellate court concluded that Mr. Olvera's counsel was not ineffective. Yet the state court's opinion left some aspects of Mr. Olvera's failure-to-investigate claim largely unaddressed. As Mr. Olvera, the State, and the district court note, the state appellate court's analysis is rather succinct and this factor complicates our presentation.[17] For ease of reading, we therefore summarize at the outset our conclusions with respect to the merits of Mr. Olvera's specific unreasonable application arguments: The state court did not unreasonably apply *Strickland* when it concluded that Espinoza's affidavit failed to demonstrate prejudice and when it concluded that Daniel Mendoza's, Damian Olvera's, and Michael Olvera's affidavits failed to demonstrate deficient performance; as for Teague's, Delgado's, and Perez's affidavits, even if we assume the state court unreasonably applied the deficient performance prong, we conclude that those affidavits do not establish prejudice (an issue we review de novo because the state court never reached the question).

---

[17] The district court's opinion is far more thorough, but our task is to review the state appellate court's reasoning, not the district court's. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion[,] … a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").

**1.**

**a.**

Because our inquiry depends, in part, on an understanding of accountability and self-defense under Illinois law, we begin by examining the relevant provisions.

On the fateful evening, Mr. Olvera never fired a shot. Under Illinois law, however, an individual can be accountable for the criminal acts of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c). To prove the defendant's accountability, "the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 6 N.E.3d 145, 149 (Ill. 2014). In Mr. Olvera's case, the State argued that the facts demonstrated both a shared intent and common design.

As for Illinois law of self-defense, an individual "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a). Relying on a self-defense argument is much more difficult for an initial aggressor. Under Illinois law, someone who "initially provokes the use of force against himself" cannot argue self-defense unless, among other things, he "exhausted every reasonable means to escape" the dangerous situation he started. 720 ILCS 5/7-4(c)(1).

**b.**

As we turn to an examination of the state appellate court's evaluation of Mr. Olvera's petition, it is important to keep Mr. Olvera's contentions in proper focus. He bases his appeal on the seven affidavits that we recounted earlier. But, throughout our consideration of his contentions, we must not lose sight of the evidence from Mr. Olvera's trial that remains untouched by his arguments. Raya testified that when Mr. Olvera picked her up at the party, he hurried her into the Buick, told her to duck down in the back seat, then sped off shortly before she heard loud bangs and smelled smoke. Rhodes, Mr. Olvera's cellblock confidant, testified that Mr. Olvera confessed to ordering Delgado to shoot at the Latin Kings. These two witnesses were important pieces in the State's case, and the core of their testimony remains intact.

**2.**

With these threshold matters in mind, we now address those aspects of Mr. Olvera's petition where our analysis tracks the state appellate court's, then move on to the affidavits where our discussion diverges.

**a.**

In his affidavit, Espinoza claims that Montalvo lied when she testified that she had overheard Mr. Olvera admit to Espinoza that he ordered Delgado to shoot at the Latin Kings. Mr. Olvera now apparently faults his counsel for not investigating this line of impeachment.

We agree with the state appellate court that Espinoza's assertion does not establish prejudice. Mr. Olvera overstates the importance of Montalvo's testimony. By the time she testified at Mr. Olvera's trial, Montalvo had become a largely

uncooperative witness. Her trial testimony consisted mostly of her stating that she did not remember the events in question, which required the prosecutor to rely on her earlier grand jury testimony. And as we noted, the jury still would have heard Raya's testimony about the moments before the shooting and Rhodes's testimony about Mr. Olvera's prison confession. The state appellate court did not unreasonably apply *Strickland* when it concluded that Espinoza's information did not demonstrate prejudice.[18]

### b.

We next consider the state appellate court's determination that Damian Olvera's, Daniel Mendoza's, and Michael Olvera's affidavits failed to demonstrate deficient performance. Even though there was no evidentiary hearing on Mr. Olvera's petition, it is clear from the face of these three affidavits that they fail to demonstrate ineffective assistance on the part of Mr. Olvera's trial counsel.

Damian Olvera states in his affidavit that he overheard Espinoza tell Montalvo to lie on the stand. He admits in his affidavit, however, that he did not come forward with this information until 2002, well after the trial. Even a thorough

---

[18] We would be remiss if we did not also mention that Mr. Olvera's trial counsel submitted an affidavit stating that Mr. Olvera "specifically instructed" him "not to interview Mr. Espinoza." R.8-12 at 8. When a competent defendant specifically instructs counsel not to interview a potential witness, that instruction significantly limits counsel's investigative obligations as to that witness. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) (a client's information and instructions define counsel's responsibility to investigate). Though the state appellate court did not reach the deficient performance question with respect to Espinoza's affidavit, we are hard-pressed to see how Mr. Olvera could make that showing.

investigation would be unlikely to reach Damian Olvera, who played no role in the evening of the shooting. Counsel's investigation, therefore, was not deficient for failing to uncover Damian Olvera.

As for Daniel Mendoza, the record shows that Mr. Olvera's counsel *did* speak with Daniel Mendoza ahead of the trial and Mendoza refused to testify on Mr. Olvera's behalf. Moreover, Daniel Mendoza ultimately did testify at the trial under a subpoena but overall was reluctant to say much of anything during his testimony. Counsel's investigation with respect to Daniel Mendoza was therefore reasonable; it is only well after the fact that Daniel Mendoza decided he has something meaningful to say.

We reach the same conclusion regarding the state appellate court's treatment of Michael Olvera's affidavit. There, Michael Olvera claimed that he overheard a conversation between Perez, Reyes, and Gutierrez, in which they stated that Reyes ran toward Mr. Olvera's car and that Delgado's shots appeared to have been in response to Reyes's action. The state appellate court concluded that Mr. Olvera's counsel was not ineffective for allegedly failing to uncover this information. We agree that, even without holding an evidentiary hearing, the state appellate court's conclusion was reasonable. Unlike the other affidavits, Michael Olvera's affidavit does not claim that Mr. Olvera's counsel failed to contact him before the trial. As the state appellate court noted, Michael Olvera's offer to testify about a conversation he allegedly overheard was rank hearsay not subject to any identifiable exception. Mr. Olvera has offered no case law suggesting counsel has an obligation to uncover and then use inadmissible hearsay. Moreover, Michael Olvera, Reyes, and Gutierrez all testified at Mr. Olvera's

trial and were cross examined by Mr. Olvera's counsel about the night of the shooting.[19] None offered the description of events that Michael Olvera now claims he overheard.

**3.**

We now turn to those situations where we believe that the state appellate court's assessment of the submitted affidavits is problematic and where our own discussion necessarily must diverge from that of the state court.

The state appellate court concluded that Delgado's affidavit failed to demonstrate deficient performance because counsel's decision not to interview Delgado or call him as a witness "relate[d] to appropriate trial strategy."[20] For Teague's affidavit, the state appellate court concluded it was not deficient performance to fail to investigate whether Teague's plans to buy Mr. Olvera's car predated the shooting because that information "had no relevance to the commission of the crime."[21] For Perez's affidavit, in which he says he saw Reyes run at Mr. Olvera's car before the shooting, the state appellate court concluded counsel's failure to interview Perez or call him as a witness was not deficient because Perez "was out of the state during the trial, and therefore counsel could not have called him to testify."[22]

The issue, as we see it, is not that the state appellate court was necessarily wrong in concluding that Mr. Olvera failed to

---

[19] Perez did not testify at Mr. Olvera's trial. We address his information below.

[20] R.8-5 at ¶ 17.

[21] *Id.*

[22] *Id.*

demonstrate deficient performance when he alleged counsel's failure to investigate Teague's, Delgado's, and Perez's information. Rather, the issue is that the state appellate court decided that counsel's investigation of these three potential witnesses was reasonable without nearly enough information about the scope of counsel's investigation. The affidavit supplied by Mr. Olvera's trial counsel in the state court proceedings offered no insight into these three witnesses, and the state court held no hearing into counsel's alleged decision not to investigate what information these witnesses had to offer.

The key principle at stake here is that *Strickland*'s presumption that counsel's decisions were reasonable "applies only if the lawyer actually exercised judgment." *Mosley*, 689 F.3d at 848. When it comes to failure-to-investigate claims, *Strickland* does not permit courts to simply assume counsel acted strategically in not calling a witness when the allegation is that counsel never investigated what that witness would have to say. *See id.* Without knowing the scope of counsel's pretrial investigation, the state court cannot answer the "critical threshold question" of whether that investigation was adequate. *Campbell*, 780 F.3d at 766. That is why we have so often emphasized—and emphasize again today—that if a state court is going to conclude that trial counsel conducted a reasonable investigation, the state court must actually understand the scope of counsel's investigation. *See Gish v. Hepp*, 955 F.3d 597, 604 (7th Cir.), *cert. denied*, 141 S. Ct. 681 (2020); *Mosley*, 689 F.3d at 848; *Davis v. Lambert*, 388 F.3d 1052, 1061 (7th Cir. 2004).

Typically, a state court can gain an understanding of trial counsel's investigative decisionmaking by reviewing a detailed affidavit from counsel or holding an evidentiary

hearing. *Cf. Lambert*, 388 F.3d at 1061 (discussing the role of witness affidavits and state court evidentiary hearings in developing the factual record for a failure-to-investigate claim). As the Supreme Court noted in *Strickland*, 466 U.S. at 691, "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." As *Strickland* also observed, the "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions." *Id.* The facts in Delgado's and Teague's affidavits are all facts Mr. Olvera would have known and could have told his attorney. But, here, the state court lacked insight into Mr. Olvera's conversations with his trial counsel. Without that insight, it could not determine whether counsel's alleged failure to investigate constitutes substandard performance.

Given these circumstances, we assume, for present purposes, that the three affidavits at issue demonstrated deficient performance and therefore turn our attention to prejudice. Because the state appellate court did not address *Strickland*'s prejudice prong when examining Teague's, Delgado's, and Perez's affidavits, our inquiry proceeds de novo. *See Gish*, 955 F.3d at 604–05 (assuming the state appellate court unreasonably applied the deficient performance prong and then moving to review de novo the previously unaddressed prejudice prong).

Mr. Olvera submits that the evidence in Teague's, Delgado's, and Perez's affidavits undercuts the State's accountability theory and presents a viable self-defense argument. Starting with the affidavits' impact on the accountability

theory, we conclude that the information in those affidavits does not undermine confidence in the jury's verdict. Teague's claim that he planned to buy Mr. Olvera's Buick before the shooting is hardly significant. Although Mr. Olvera contends that the affidavit shows he was not trying to quickly dispose of evidence of his criminal activity, Teague's affidavit easily cuts the other way. There is no dispute that Teague obtained possession of the car right after the shooting. That Teague showed interest in the car ahead of the shooting may just mean that Mr. Olvera knew he had a ready buyer and could rid himself of evidence that could tie him to the shooting. With respect to the claims in Delgado's affidavit, these contradict the statements Delgado made during his own sentencing that implicated Mr. Olvera in the shooting. It is notable, too, that Delgado's first affidavit filed alongside this petition lacked any mention of the more dramatic allegations included in his second affidavit.[23]

Even when we consider Teague's, Perez's, and Delgado's affidavits, there simply is no reasonable probability that the outcome of the case would have been different. The jury still would have heard Rhodes testify that Mr. Olvera admitted to ordering Delgado to fire at the Latin King members during the second shooting. Moreover, the fatal shooting happened on the second pass of the Latin King members, and Raya testified that Mr. Olvera instructed her to duck down before that shooting occurred. That is strong evidence that Mr. Olvera was accountable for Delgado's shooting Stropes.

Mr. Olvera's self-defense argument is even less persuasive. Illinois law makes clear that an initial aggressor cannot

---

[23] *See supra*, at 9.

claim self-defense unless he "exhausted every reasonable means to escape" the dangerous situation he started. 720 ILCS 5/7-4(c)(1). The evidence at trial showed that Mr. Olvera and Delgado fired one shot on their first pass of the Latin King members, then additional shots on their second pass. It was during the second pass that Delgado shot and killed Stropes. None of the affidavits undercut this basic timeline. As Ramos, one of the partygoers, testified at trial, Mr. Olvera pulled up, yelled for Raya to hurry into the car, then "took off real fast" shortly before Ramos heard the second set of gunshots.[24] And the jury could reasonably interpret Raya's testimony about Mr. Olvera's telling her to duck in the backseat to mean that Mr. Olvera knew more violence was about to occur.

The shooting on the first pass made Mr. Olvera and Delgado the initial aggressors. Self-defense, therefore, is unavailable to them unless they exhausted every reasonable means of escape. It is clear that they did not. Instead, they drove back in the direction of the Latin Kings and fired more shots. Even if Reyes did run at the car, that does not change the fact that Mr. Olvera and Delgado were the initial aggressors. As a result, Mr. Olvera's new self-defense claim does not undermine confidence in the verdict.

Even if we assume that Mr. Olvera's trial counsel conducted an inadequate investigation into Delgado's, Teague's, and Perez's information, there was no prejudice to Mr. Olvera. Looking at all of the information available, the overwhelming evidence supports the State's accountability theory and precludes Mr. Olvera's claim of self-defense.

---

[24] R.8-16 at 82.

**Conclusion**

In sum, we reject Mr. Olvera's contention that the state court's articulation of the *Strickland* standard was contrary to the Supreme Court's clearly established law. We also hold that the state court did not unreasonably apply *Strickland* when it concluded that Espinoza's affidavit failed to demonstrate prejudice and when it concluded that Daniel Mendoza's, Damian Olvera's, and Michael Olvera's affidavits failed to demonstrate deficient performance. As for Teague's, Delgado's, and Perez's affidavits, even if we assume the state court unreasonably applied the deficient performance prong, those affidavits do not establish prejudice.

Consequently, Mr. Olvera has failed to demonstrate ineffective assistance by his trial counsel. We therefore affirm the district court's denial of his petition under 28 U.S.C. § 2254.

AFFIRMED